**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| WEIRTON AREA WATER BOARD; *and* CITY OF WEIRTON, WEST VIRGINIA, <br><br> *Plaintiffs,* <br><br> - *v* - <br><br> ARCWOOD ENVIRONMENTAL – EAST LIVERPOOL INC.; *and* ARCWOOD TRANSPORT LLC, <br><br> *Defendants.* | **C.A. No.** <br><br> **CERCLA COMPLAINT** <br> **42 U.S.C. §§ 9607(a)** <br> **and 9613(f)(1)** |

**<u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>**

COMES NOW, the Plaintiffs, THE WEIRTON AREA WATER BOARD *and* THE CITY OF WEIRTON, WEST VIRGINIA (hereinafter collectively "Plaintiffs"), and for their Complaint against the Defendants, ARCWOOD ENVIRONMENTAL – EAST LIVERPOOL INC. *and* ARCWOOD TRANSPORT LLC (hereinafter collectively, "Defendants"), aver and state as follows:

**<u>INTRODUCTION</u>**

1.     Plaintiffs own and/or operate a public water system utility serving close to 25,000 residential, commercial, industrial, public authority, and resale customers in the City of Weirton, West Virginia and surrounding areas of Hancock and Brooke Counties, West Virginia.

2.     Plaintiffs own and/or operate a water treatment plant located in Brooke County, West Virginia (the "Weirton Water Treatment Plant"), which utilizes as its water sources an intake located in the Ohio River in Brooke County and a Ranney collector well located near the Ohio

River in Brooke County (the "Water Sources"). Plaintiffs draw and treat water from the Water Sources and then provide the water as drinking water to Plaintiffs' customers.

3. In this civil action, Plaintiffs seek to recover the substantial costs associated with removing synthetic per- and polyfluoroalkyl substances ("PFAS") existing in Plaintiffs' Water Sources.

4. PFAS are man-made chemical compounds used in a variety of industrial and commercial products and applications.  They are part of a class of chemicals called "emerging contaminants" because they have only recently been detected in the environment, until relatively recently were not well regulated, and their significant health risks were only fully understood recently.  Generally, PFAS do not degrade through normal chemical, physical or biological processes.  This resistance made them useful in industrial and commercial applications (products like Teflon and Gortex are examples cited frequently), but these same qualities have raised significant concern due to their persistence in drinking water.

5. Exposure to PFAS has been demonstrated to lead to significant negative health impacts, including (i) reproductive effects such as decreased fertility or increased high blood pressure in pregnant women; (ii) developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes; (iii) increased risk of some cancers, including prostate, kidney, and testicular cancers; (iv) reduced ability of the body's immune system to fight infections, including reduced vaccine response; (v) interference with the body's natural hormones; and (vi) increased cholesterol levels and/or risk of obesity.[1]

---

[1] Environmental Protection Agency, Our Current Understanding of the Human Health and Environmental Risks of PFAS, https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas.

6.      Plaintiffs bring this action to address the existence of PFAS in water drawn from its Water Sources, to recover costs associated with removal of PFAS from water drawn from its Water Sources, , and for such other relief to ensure Plaintiffs' continued compliance with all applicable state and federal laws and regulations concerning its drinking water.

7.      Plaintiffs further bring this action to seek, *inter alia*, available remedies under the Comprehensive Environmental Response, Compensation, and Liability Act, including all necessary funds to compensate Plaintiffs for the costs of investigating, monitoring, evaluating, abating, and remediating the presence of PFAS in water drawn from its Water Sources, including constructing, installing, operating, and maintaining the treatment facilities and equipment required to remove PFAS from public water supplies; and for such other damages and relief the Court may order.

8.      Defendants' facilities are located within the hydrological features of Plaintiffs' Water Sources and used and/or processed materials containing PFAS in their business operations, and who released, stored, handled, and/or disposed of PFAS and PFAS containing materials in such a manner that has caused PFAS to migrate into and exist in Plaintiffs' Water Sources, thereby damaging and injuring Plaintiffs.

9.      Defendants as the responsible parties, and not Plaintiffs, its taxpayers, or its customers, should bear all past, present, and future costs of addressing the above presence and removal of PFAS from the Water Sources.

10.     Defendants are responsible, negligently, intentionally and/or in some actionable manner, jointly and severally, for the events and happenings referred to herein, and caused and continue to cause injuries and damages legally thereby to Plaintiffs, as alleged, either through Defendants' own conduct or through the conduct of their agents, servants or employees, or due to

3

the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

**JURISDICTION AND VENUE**

11.     Plaintiffs bring this civil suit, in part, pursuant to sections 42 U.S.C. §§ 9607(a), 9613(f)(1), and 9613(g) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").

12.     Under 28 U.S.C. § 1331, 42 U.S.C. § 6972(a), and 42 U.S.C. § 9613(b) this Court has jurisdiction over Plaintiff's CERCLA claims. This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367 because those claims are so related to the CERCLA claim as to form part of the same case or controversy.

13.     Venue as to each Defendant is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in the Northern District of Ohio and the property that is the subject of the action is situated in this District.

14.     This Court has personal jurisdiction over each Defendant because at all relevant times they committed acts in Ohio, conducted business in the State of Ohio, were engaged in substantial business activities in Ohio, carry on continuous and systematic business in Ohio, are registered to do business in Ohio and have purposefully availed themselves of the privilege of conducting business within Ohio, consented to be sued in the State of Ohio by registering an agent for service of process, and/or because they have the requisite minimum contacts with the State of Ohio necessary to constitutionally permit the Court to exercise jurisdiction.

## PARTIES

**Plaintiffs**

15.     **Plaintiff THE WEIRTON AREA WATER BOARD** ("Water Board") is a governmental entity and/or agency and/or sub-agency of Weirton, which was created in 2001 by City Ordinance #1317 under applicable West Virginia law and is vested with the authority and responsibility to operate, supervise, manage, and control a water utility system pursuant to West Virginia Code Chapter 8, Article 19. The Water Board's principal place of business is located in Weirton, Brooke County, West Virginia.

16.     **Plaintiff THE CITY OF WEIRTON** ("Weirton") is a municipal corporation of the State of West Virginia which may sue and plead in its own name. W. Va. Code § 7-1-1(a) (2008); Kucera v. City of Wheeling, 153 W. Va. 531, 170 S.E.2d 217 (1969). Weirton's principal place of business is located in Weirton, West Virginia.

17.     Plaintiffs own and/or operate a municipal public waterworks system which consists of, inter alia, the Water Sources, the Weirton Water Treatment Plant, reservoir, water tanks, distribution lines, booster stations, and all appurtenant facilities and properties (collectively the "Water System").

18.     Plaintiffs own, operate, and/or maintain the Water System for the benefit of the public and are charged with delivering safe, clean, and high-quality water that meets State and federal standards to close to 25,000 residents and businesses in Hancock and Brooke Counties, West Virginia.

**Defendants**

19.     **Defendant ARCWOOD ENVIRONMENTAL – EAST LIVERPOOL INC.** ("Arcwood East Liverpool") is a Delaware Corporation with its principal place of business at or

5

near 1250 St. George Street, East Liverpool, Columbiana County, Ohio. Its registered agent is CT Corporation System, 4400 Easton Commons Way, Suite 125, Columbus OH 43219.

20.     Arcwood East Liverpool is the current owner and/or operator of a hazardous waste incinerator and related treatment, storage, and disposal units located at approximately 1250 St. George Street, East Liverpool, Ohio, operating under EPA Identification Number OHD980613541 and permits issued by the U.S. EPA and the Ohio Environmental Protection Agency (the "East Liverpool Facility").

21.     The East Liverpool Facility has listed NAICS codes of 562211 (Hazardous Waste Treatment and Disposal) and 562213 (Solid Waste Combustors and Incinerators). EPA classifies facilities with these NAICS codes as being at an elevated risk of PFAS use, storage, or release.

22.     At relevant times herein, the East Liverpool Facility accepted and continues to accept a broad range of hazardous and non-hazardous liquid and solid wastes from generators across the United States, including wastes from chemical manufacturing plants, coke by-product plants, petroleum refineries, wastewater treatment plants, water filtration media, and other industrial facilities. This waste contains PFAS, including PFOS and PFOA. The East Liverpool Facility also performs fuel blending and accepts waste for transfer to other waste management facilities.

23.     **Defendant ARCWOOD TRANSPORT LLC** is an Indiana Limited Liability Company and registered to do business in the State of Ohio that provides transportation services for hazardous and non-hazardous waste to and from the East Liverpool Facility and other locations ("Arcwood Transport").

24.     On information and belief, Arcwood East Liverpool is the amended name of Heritage Thermal Services, Inc. with respect to the ownership and operation of the East Liverpool

6

Facility, and Arcwood Transport is the amended name of Heritage Transport, LLC with respect to waste transportation operations serving the East Liverpool Facility, such that Arcwood East Liverpool and Arcwood Transport have assumed and/or are liable for the environmental liabilities of their Heritage predecessors under applicable federal and state law. Arcwood East Liverpool and Arcwood Transport are referred to, collectively, as "Arcwood." At all times material herein, Arcwood purposefully directed its actions toward the State of West Virginia; carried out is actions, conduct, and omissions in the operation of the East Liverpool Facility with the knowledge that its actions would cause tortious injury and harm in West Virginia, including Brooke and Hanock Counties; caused direct and foreseeable tortious harms and injuries in West Virginia, including Brooke and Hancock Counties; and caused direct tortious effects, injuries, and damages to Plaintiffs in West Virginia, including Brooke and Hancock Counties.

## BACKGROUND AND FACTUAL ALLEGATIONS

### PFAS

25.     Per- and polyfluoroalkyl substances ("PFAS") are a large class of synthetic fluorinated chemical compounds containing strong carbon–fluorine bonds. Their carbon–fluorine bond is among the strongest chemical bonds in nature and gives PFAS unique chemical properties, including resistance to heat, oil, water, and grease. Because of these properties, PFAS have been widely used for decades in numerous industrial, commercial, and consumer applications, including electroplating operations, industrial coatings, non-stick and corrosion-resistant surfaces, stain-resistant textiles, petroleum production processes, and other products designed to resist grease, oil, and water.

26.     Unlike traditional water contaminants, PFAS can cause human health impacts at incredibly small concentrations. For example, drinking water contaminants like chloride, copper, and nitrate are tested and measured in milligrams per liter; one milligram per liter is equivalent to

one part per million. Other drinking water contaminants like lead and sodium are measured in micrograms per liter; one microgram per liter is approximately one part per billion. PFAS are an order of magnitude smaller. PFAS are measured in nanograms per liter; one nanogram per liter is approximately equivalent to **one part per _trillion_** ("ppt"). To put this in perspective, 1.0 ppt is roughly the equivalent of one drop of water in 20 Olympic-size swimming pools, or 1 second in 32,000 years.

27. PFAS are commonly released into the environment from industrial facilities that manufacture, use, handle, or dispose of PFAS-containing materials. Releases may occur through multiple pathways, including air emissions, industrial wastewater discharges, spills, stormwater runoff, waste disposal practices, and attempts to destroy PFAS-containing waste through high-temperature treatment or incineration.

28. Due to the strength of the carbon–fluorine bond, PFAS are extremely resistant to degradation by sunlight, water, or biological processes. As a result, PFAS persist for long periods of time in environmental media, particularly in surface water and groundwater. Because they remain in the environment for many years or decades, PFAS are widely referred to as "forever chemicals."

29. PFAS are also highly mobile in the environment. Many PFAS compounds readily dissolve in water and migrate through soils into groundwater aquifers and surface water systems. For example, compounds such as perfluorooctane sulfonic acid ("PFOS") are highly water-soluble and persistent and can spread rapidly through environmental pathways, including groundwater and river systems. PFAS deposited onto soils can leach downward into groundwater and migrate with groundwater flow, while PFAS discharged directly to rivers can travel very long distances downstream.

30. PFAS have been found to travel over 100 miles in rivers like the Cape Fear River, Tennessee River, and the Mississippi River. River velocity allows contaminants like PFAS to move tens of miles per day.

31. Scientific and regulatory authorities recognize that PFAS contamination often originates from industrial facilities that emit PFAS into the atmosphere or discharge PFAS-containing wastewater. Air emissions of PFAS can travel through the atmosphere and subsequently deposit onto nearby land or surface waters through wet or dry deposition. Once deposited on land, PFAS can infiltrate soils and migrate downward into groundwater aquifers. PFAS deposited directly onto rivers, lakes, or reservoirs dissolve in the water column and can be transported downstream to drinking water intakes and other sensitive receptors, such as groundwater wells near river relying on infiltration of river water.

32. PFAS contamination can also occur when PFAS-containing industrial wastewater or stormwater is discharged into rivers or other surface waters. Because PFAS are persistent and mobile in aquatic environments, once discharged they can remain in the water column, migrate downstream, and infiltrate connected groundwater systems, including riverbank and alluvial aquifers used as drinking water sources.

33. Conventional drinking water treatment processes are largely ineffective at removing PFAS from water once contamination occurs. As a result, when PFAS enter a drinking water source, they often persist through treatment processes and remain present in finished drinking water delivered to consumers.

34. Exposure to PFAS has been linked to numerous adverse human health effects. Scientific studies and evaluations by federal health agencies—including the United States Environmental Protection Agency ("EPA"), the Agency for Toxic Substances and Disease

9

Registry ("ATSDR"), and other public health authorities—have identified associations between PFAS exposure and a variety of serious health outcomes.

35. Epidemiological studies have linked exposure to certain PFAS, including perfluorooctanoic acid ("PFOA") and PFOS, to kidney cancer, testicular cancer, thyroid disease, ulcerative colitis, and elevated cholesterol levels, as well as pregnancy-induced hypertension and other developmental impacts.

36. Other research has identified associations between PFAS exposure and immune system effects, including reduced vaccine response, changes in liver enzymes, increased cholesterol, developmental effects in fetuses and children, and reproductive effects such as preeclampsia and reduced birth weight.

37. PFAS are also known to bioaccumulate in living organisms, including humans. Unlike many persistent pollutants that accumulate in fatty tissue, PFAS bind to proteins in blood and organs. Once ingested—such as through drinking water—PFAS can remain in the human body for years. Repeated exposure to PFAS through contaminated drinking water can therefore lead to significant accumulation of these chemicals in the body over time.

38. Because PFAS accumulate in the body and persist in environmental media, long-term exposure—even at very low concentrations—can increase the risk of adverse health outcomes. Public health authorities have concluded that exposure to PFAS in drinking water may contribute to cancer, immune system dysfunction, endocrine disruption, developmental effects in infants and children, liver damage, and other serious health conditions.

39. Due to the persistence, mobility, and potential health risks associated with PFAS exposure, federal regulators have taken significant steps to address PFAS contamination in drinking water. In April 2024, EPA issued the first national drinking water standards for certain

PFAS under the Safe Drinking Water Act, including maximum contaminant levels of 4 parts per trillion ("ppt") for both PFOA and PFOS, reflecting EPA's determination that extremely low concentrations of these chemicals in drinking water pose risks to human health.[2] On May 14, 2025, the Trump Administration announced that EPA would retain these low drinking water standards for PFOA and PFOS.[3]

40.    EPA has also formally recognized the dangers posed by PFAS releases under federal environmental law. Effective July 9, 2024, EPA designated both PFOA and PFOS as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), after determining that these chemicals may present a substantial danger to public health or the environment when released.[4] Under CERCLA, the quantity or concentration of a hazardous substance is not a factor.

41.    Industrial facilities such as hazardous waste incinerators that handle and dispose of PFAS-containing waste can release PFAS into the environment through multiple pathways. These pathways include emissions from incinerator stacks, atmospheric transport and deposition of PFAS-containing particulates, contamination of surrounding soils and groundwater, and wastewater discharges containing PFAS compounds.

42.    Air emissions from industrial incinerators can transport PFAS and PFAS-related byproducts through the atmosphere, where they can deposit onto nearby land surfaces and surface waters through wet and dry deposition. PFAS deposited onto soils can subsequently infiltrate into

---

[2] *See* Final Rule, PFAS National Primary Drinking Water Standards, *See* 89 Fed. Reg. 32532 (April 26, 2024).

[3] *See* EPA Press Release, *EPA Announces it Will Keep Maximum Containment Levels for PFOA, PFOS* (May 14, 2025), available at https://www.epa.gov/newsreleases/epa-announces-it-will-keep-maximum-contaminant-levels-pfoa-pfos.

[4] Final Rule, Designation of Perfluorooctanic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 89 Fed Reg. 39124 (May 8, 2024).

groundwater aquifers, while PFAS deposited directly onto rivers can dissolve into the water column and migrate downstream.

43.     PFAS can also enter surface waters through wastewater discharges and stormwater runoff associated with the handling, storage, and treatment of PFAS-containing wastes. Once released into rivers or other surface waters, PFAS remain persistent and mobile, allowing them to travel long distances downstream and contaminate drinking water sources that draw from those waters.

44.     These environmental transport mechanisms create pathways by which PFAS released from a hazardous waste incinerator such as the East Liverpool Facility that accept PFAS-containing wastes located upstream of municipal drinking water systems can migrate through surface water, groundwater, and atmospheric deposition to contaminate drinking water supplies serving downstream communities.

<b>DEFENDANTS' TORTIOUS OPERATION OF<br>THE ARCWOOD WASTE INCINERATOR AT THE EAST LIVERPOOL FACILITY</b>

**A.     The Arcwood Waste Incinerator**

45.     The East Liverpool Facility employs a rotary kiln incinerator system with a secondary combustion chamber, waste heat boiler, and downstream air pollution control devices including, upon information and belief, an electrostatic precipitator and wet scrubbing system designed to remove particulate matter and acid gases from combustion gases prior to stack discharge.

46.     The East Liverpool Facility is regulated as a hazardous-waste Treatment, Storage, and Disposal Facility ("TSDF") under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., and operates pursuant to federal and state hazardous-waste permits issued

by the United States Environmental Protection Agency ("EPA") and the Ohio Environmental Protection Agency ("Ohio EPA").

47. The East Liverpool Facility also operates pursuant to a Clean Air Act Title V operating permit governing air emissions from hazardous-waste combustion.

48. The East Liverpool Facility's RCRA permits authorize it to incinerate certain hazardous wastes that meet specified acceptance criteria, operating conditions, and waste-analysis requirements.

49. Neither its RCRA permits nor its Clean Air Act Title V permit expressly authorize the incineration of PFAS-containing wastes as a distinct category of waste.

50. Rather, any acceptance of PFAS-containing materials is governed, if at all, by general hazardous-waste provisions, waste-characterization procedures, and facility-specific approval of individual waste streams.

51. PFAS are not comprehensively regulated under RCRA as a hazardous-waste category, and EPA has not promulgated incinerator standards specifically addressing PFAS destruction or emissions.

52. At all relevant times, there has been no federal or state permit program specifically authorizing the incineration of PFAS waste and waste containing PFAS.

53. The East Liverpool Facility therefore lacks any permit expressly determining that PFAS wastes can be destroyed safely through incineration or that emissions of PFAS, including PFOA and PFOS, or PFAS byproducts have been and are controlled adequately.

54. In the normal course of business, Arcwood and its predecessors have marketed and provided nationwide PFAS management and disposal services, including incineration of

PFAS-containing waste streams generated by industrial customers, manufacturers, and other entities.

55.     Because of the strength of their chemical bonds, PFAS do not readily burn and are not destroyed under typical incinerator conditions. Instead, the East Liverpool Facility emits uncombusted PFAS into the air along with other hazardous chemicals, contaminating the area around the East Liverpool Facility and the Ohio River.

56.     EPA has acknowledged uncertainty regarding the effectiveness of high-temperature incineration to fully destroy PFAS and prevent formation of harmful byproducts.

57.     At all relevant times, the East Liverpool Facility lacked validated, enforceable performance standards demonstrating complete destruction of PFAS compounds in its waste feed.

58.     The East Liverpool Facility also lacked continuous monitoring capable of detecting PFAS emissions or verifying compliance with any PFAS-specific destruction efficiency.

**B.     Defendants' Incineration of PFAS Waste in Violation of EPA Regulations**

59.     On information and belief, from at least 2016 (and most likely far earlier) through the present, the East Liverpool Facility received and incinerated PFAS-containing wastes, including but not limited to: (a) industrial wastewaters, sludges, and still bottoms containing PFOA, PFOS, and other long- and short-chain PFAS; (b) off-specification or returned PFAS-containing products; (c) PFAS-laden sorbents and filter media from environmental remediation and wastewater treatment systems; (d) and other waste containing PFAS.

60.     On information and belief, Arcwood and its predecessors entered into contracts with waste brokers, industrial generators, and remediation contractors to accept PFAS-bearing wastes for incineration at the East Liverpool Facility, representing that such wastes could be safely and effectively destroyed and that emissions and residuals would comply with applicable environmental standards.

14

61.     The East Liverpool Facility's operations generate ash, slag, and other solid combustion residues, which are collected from the combustion chambers and air pollution control devices and then transported off-site to hazardous or non-hazardous landfills, or otherwise managed as waste. On information and belief, these residues have contained un- or partially-destroyed PFAS and PFAS transformation products.

62.     The East Liverpool Facility is located on the Ohio River in East Liverpool, Ohio, just upstream from Weirton, West Virginia, the same river from which Weirton obtains some or all of its drinking water supply.

63.     The East Liverpool Facility has a long history of environmental and contamination-related violations, evidencing PFAS release pathways in addition to those occurring from normal operations. For example, in October 2018, Arcwood entered into a consent decree with the United States Department of Justice ("DOJ") and EPA, lodged in the Northern District of Ohio, following years of Clean Air Act violations at the East Liverpool Facility ("Consent Decree").[5] The Consent Decree evidences how Arcwood operated its hazardous waste incinerator for years with systemic Clean Air Act violations that directly undermined combustion efficiency and air pollution controls, creating multiple pathways for uncontrolled releases of hazardous air pollutants and PFAS, including PFOA and PFOS, to the surrounding community and the Ohio River.

64.     The Consent Decree evidences how Arcwood failed to comply with, among other things, (i) emission standards for hazardous air pollutants; (ii) operating parameter limits necessary to comply with the Clean Air Act's destruction and removal standards; and (iii) requirements to duct emissions to air pollution control equipment. Importantly, these violations included failing to

---

[5] *See United States of America v. Heritage Thermal Services, Inc.*, C.A. No. 4:18-cv-2419 (N.D. Ohio Oct. 18, 2018) Consent Decree, *available at* https://www.justice.gov/enrd/consent-decree/file/1101886/dl.

15

maintain minimum temperatures in its incinerator as specified in its Clean Air Act permit "on numerous days." These violations show Arcwood was operating the East Liverpool Facility in a manner that increased formation and reduced capture of contaminants like PFAS, allowing higher mass loadings of contaminants to pass through the East Liverpool Facility's emission stack and, when controls were bypassed or impaired, to escape uncontrolled to ambient air.

65. DOJ and EPA found that Arcwood's own semi-annual reports showed that on numerous days beginning in at least 2011 and continuing thereafter, Arcwood operated the incinerator in a manner such that the combustion chamber temperature inside the secondary combustion chamber and the rotary kiln fell below the applicable minimum temperatures in violation the East Liverpool Facility's Clean Air Act Title V Permit.

66. These violations represent direct release pathways for partially combusted gases and entrained ash to escape without passing through a flue gas cleaning system and scrubbers. EPA and DOJ cite Arcwood's own semi-annual reports and responses to EPA information requests to show these patterns of excess total hydrocarbon emissions, pressure excursions, operating limit violations, and loss of ducting during upset events over multiple years, confirming that Arcwood operated the incinerator outside the envelope needed to ensure complete destruction of hazardous wastes repeatedly, and failed to effectively capture combustion byproducts.

67. Importantly, DOJ and EPA found that on July 13, 2013, an explosion at the East Liverpool Facility ruptured incinerator ducting and released untreated flue gas, steam, and boiler ash beyond the East Liverpool Facility's fence line, and that this incident was attributed to Arcwood's systemic failures to comply with the Clean Air Act - demonstrating not only stack emissions but also fugitive and bypass releases resulting from structural failure of the combustion and ductwork system. The explosion constitutes an uncontrolled emission pathway whereby

16

hazardous air pollutants and ash residues (both including PFOA, PFOS, and other PFAS) escaped prior to treatment by required air pollution control devices, thereby evidencing release of PFOA, PFOS, and other PFAS beyond the property boundary and depositing on the Ohio River and other areas.

68.     Following the Consent Decree, in November 2018 the Vermont Department of Environmental Conservation cancelled plans to send PFAS-containing materials to the East Liverpool Facility, citing concerns about the facility's environmental violations and poor operating conditions.

69.     On December 18, 2019, an EPA official wrote to the East Liverpool City Council to express "concern over the incineration of PFAS waste" at the East Liverpool Facility and informed the Council that the EPA was "evaluating whether the incineration of PFAS is a violation of the East Liverpool Facility's permit."

70.     According to the EPA, in an approximate period between 2019-2022, Arcwood violated the Clean Air Act in eight (8) of twelve (12) quarters. In June 2022 a fire erupted near Arcwood's air pollution control equipment; in 2024 Arcwood and its insurers filed a $31 million lawsuit because of this fire.

C.     **Investigation Confirming PFOS and PFOA Contamination at the East Liverpool Facility**

71.     Between 2021 and 2023, a research team examined the distribution and concentration of PFAS in soil samples adjacent to the East Liverpool Facility ("PFAS Incinerator Study").[6] The PFAS Incinerator Study included soil samples within a two-mile radius of the East Liverpool Facility, including in East Liverpool, Ohio and directly across the Ohio River in Chester,

---

[6] *See* Martin, K.V., Hilbert, T.J., Reilly, M., *et al*., *PFAS soil concentrations surrounding a hazardous waste incinerator in East Liverpool, Ohio, an environmental justice community*, Environ. Sci. Pollut. Res. 30, 80643–80654 (2023), https://doi.org/10.1007/s11356-023-27880-8.

West Virginia. All soil samples taken had measurable amounts of PFAS, including PFOA and PFOS. PFOS was measured in 97% of the samples. PFOS samples ranged from 50 ppt to 8,300 ppt. POFA was measured in 94% of the soil samples with a range of 51 ppt to 1,300 ppt.

72. The PFAS Incinerator Study also collected water samples in the Ohio River and creeks and streams surrounding the East Liverpool Facility directly upstream of the Weirton Water System and Water Sources. These included waters adjacent to the East Liverpool Facility in East Liverpool, Ohio, the shoreline of the Ohio River, and samples across the river in Chester, West Virginia. Most surface water samples had quantifiable levels of PFOA and PFOS. The PFOA levels ranged from 4.5 ppt to 19 ppt, and PFOS concentrations ranged from 2.1 ppt to 11 ppt.

73. In recent years, Arcwood has self-reported releases of significant amounts of PFOA to the Ohio River and surrounding watershed. EPA's Toxic Release Inventory ("TRI") is a public resource that publishes chemical release data self-reported by the regulated community. It is a requirement under Section 313 of the Emergency Planning and Community Right to Know Act ("EPCRA"). *See* 42 U.S.C. § 11023. Congress included EPCRA in the Superfund Amendments and Reauthorization Act of 1986 ("SARA") to help communities plan for chemical emergencies.[7] EPCRA requires industry to report on the storage, use, and releases of certain chemicals to local and federal government. Facilities that meet specific industry classifications and thresholds must report releases of designated chemicals annually to EPA. Arcwood is among those facilities that must report to EPA.

74. TRI complies information on the quantities of certain chemicals that facilities release to the environment, including air emissions, surface water discharges, and land disposal.

---

[7] *See* SARA, Title III; Public Law 99-499, 100 Stat. 1613 (Oct. 17, 1986).

75. Prior to 2020, PFAS were not included in the TRI. However, in 2020 Congress, through the National Defense Authorization Act ("NDAA"), added certain PFAS to the list of chemicals covered by TRI. *See* NDAA for Fiscal Year 2020, Section 7321 (P.L. 116-92). PFOA was among the first major group of PFAS added to the TRI. EPA has only added to this list since that time, as the agency's understanding of the harmful effects of PFAS has grown.

76. Analysis of the East Liverpool Facility's TRI reports from 2020 to 2024 (the most recently available) demonstrate that the East Liverpool Facility self-reported PFOA releases. For example, in reporting-year 2021, Arcwood reported releasing approximately 4 pounds of PFOA air emissions and a reporting-year 2024 release of ammonium perfluorooctanoate ("APFO"), a PFOA salt.

77. Those reported quantities are environmentally significant. Four pounds of PFOA equals roughly 1.81 billion micrograms of PFOA mass. At EPA's current drinking-water MCL of 4 ng/L (4 ppt), that quantity of PFOA alone is enough mass, if distributed into water, to contaminate roughly 113 billion liters, or about 30 billion gallons, of water at or above the federal limit. Likewise, one pound of APFO corresponds to approximately 454 million micrograms of PFAS mass—enough, using the same arithmetic, to contaminate about 28 billion liters, or roughly 7.5 billion gallons, at 4 ppt. Stated differently, Arcwood's own TRI reporting reflects PFOA releases with the capacity to degrade an immense volume of water even before accounting for the East Liverpool Facility's repeated years of noncompliance with environmental laws, the persistence of PFAS, and atmospheric transport, deposition, or incomplete destruction.

78. Arcwood's own reporting also supports the inference that its TRI numbers are conservative rather than exhaustive. Arcwood's PFAS release reporting was not based on direct stack measurement. Rather, the corresponding EPA Form R submissions indicate that the East

Liverpool Facility estimated its emissions based on certain assumptions and did not do any direct emissions monitoring. In light of the East Liverpool Facility's role as a hazardous-waste combustor, its reported handling of very large PFAS-related waste quantities, and its own reporting of PFOA and APFO releases, Arcwood's own EPA submissions support the inference that PFAS-containing emissions were generated and discharged from the East Liverpool incinerator during routine operations. This raises the plausible inference that Arcwood's TRI-reported PFAS releases understate the true quantity of PFOA-related material emitted from its incinerator.

79.     During the above-described incineration operations, PFAS-containing waste received at the East Liverpool Facility were not destroyed completely and instead resulted in persistent PFAS and PFAS byproducts, including PFOA and PFOS, being released into the environment through one or more of the following pathways:

a. Air emissions of PFAS and PFAS byproducts through the East Liverpool Facility's stack, followed by atmospheric transport and deposition onto the Ohio River and its watershed upstream of the Weirton's Water System and Water Sources;

b. Air emissions of PFAS and PFAS byproducts through the East Liverpool Facility's stack, followed by atmospheric transport and deposition in West Viriginia, followed by migration to the groundwater and Weirton's Water Sources from which Plaintiff draws its drinking water;

c. Management, storage, and disposal of PFAS-containing ash and other solid residues at on-site or off-site locations in the Ohio River watershed, resulting in PFAS leaching into surface water, groundwater, and tributaries that discharge into the Ohio River upstream of Weirton's Water System and Water Sources;

20

d. Discharges of process wastewater, scrubber blowdown, stormwater, or other East Liverpool Facility effluents containing PFAS or PFAS precursors to the Ohio River or its tributaries, whether directly or via municipal treatment works;

e. Releases associated with transportation, handling, and transfer of PFAS-containing wastes to and from the East Liverpool Facility by Arcwood Transport and its predecessors, including spills, leaks, or improper handling at intermediate staging or transfer points in the Ohio River basin; *and*

f. Releases of PFAS associated with documented accidents, fires, and spills at the East Liverpool Facility, resulting in PFAS releasing into the Ohio River and surrounding area.

80. Arcwood's acceptance and incineration of PFAS-containing waste under permits that do not specifically authorize such activity, and without adequate safeguards to prevent environmental release, constitutes unlawful treatment and disposal of hazardous substances and an imminent and substantial endangerment within the meaning of applicable federal and state environmental laws.

**DEFENDANTS' TORTIOUS CONDUCT CAUSES PFAS TO MIGRATE TO AND EXIST IN PLAINTIFFS' WATER SOURCES**

81. As a result of Defendants' tortious actions, omissions, and conduct in the use, release, storage, handling, and/or disposal of PFAS and PFAS containing materials at, near, or within the vicinity of the groundwater protection area for Plaintiffs' Water Sources, PFAS, including PFOA and PFOS, have been caused to migrate into and exist in Plaintiffs' Water Sources and property, thereby damaging and injuring Plaintiffs.

82. The Source Water Assessment and Protection program is a requirement of the federal Safe Drinking Water Act that obligates every state to inventory land uses within the

21

recharge areas of all public water supply sources, assess each source's susceptibility to contamination from those land uses, and publicize the results to support improved protection. *See* 42 U.S.C. § 300j-13. In 2003, the West Virginia Department of Health and Human Resources prepared such report for Plaintiff's Water Sources ("Weirton's SWAP").[8]

83.     Weirton obtains drinking water from a type of groundwater well known as a Ranney collector well, located in the sandy and gravelly deposits along the Ohio River. Unlike a deep bedrock well that draws only from isolated groundwater, a Ranney collector is designed to pull in river water. It uses horizontal pipes that extend outward underground toward the river, and when the system pumps water, it creates suction that causes water from the Ohio River to move through the riverbed and into the surrounding groundwater before being captured by the well. Weirton's SWAP describes this setting as an unconfined alluvial aquifer with high sensitivity, meaning water — and contaminants in that water — can move relatively easily between the river and the groundwater supplying the well. Weirton's SWAP also mapped the area that feeds water to this well using groundwater modeling, confirming that in addition to groundwater the well draws from areas connected to the river.

84.     Because this well operates by pulling river water underground, a significant portion of the drinking water supply is river water that has filtered through the riverbank sediments. The well pumps nearly two million gallons per day, which increases the pull of river water toward the well. When water moves from the river into the aquifer, anything dissolved in that river water can move with it. Weirton's SWAP concluded that this source is highly susceptible to contamination precisely because the aquifer is shallow, unconfined, and hydraulically connected to the river. In

---

[8] *See* West Virginia Dept. of Health and Human Resources, *Source Water Assessment Report for Weirton Area Water Board* (March 2003), available at https://www.wvdhhr.org/oehs/eed/swap/get.cfm?id=3300516GW.

other words, there is no strong natural barrier separating the river from the groundwater that feeds the well.

85.     PFAS chemicals released upstream into the Ohio River can remain dissolved in water for long distances and do not readily break down. As that contaminated river water flows past Weirton, the pumping of the Ranney collector well draws some of that water through the riverbed and into the groundwater system supplying the well. While the natural filtration that occurs as water passes through sand and gravel can remove dirt and some microbes, it does not effectively remove dissolved PFAS, which are persistent and mobile in water. As a result, PFAS discharged upstream into the Ohio River travel downstream in the river, migrate underground through the riverbank, and ultimately captured by the Ranney collector well that supplies the community's drinking water.

86.     Between 2019 and 2022, the United States Geological Survey (USGS) and the West Virginia Division of Health and Human Resources conducted a series of tests of source and finished water quality in various public water systems across West Virginia, including Weirton. These tests focused on the presence of various PFAS in Plaintiffs' Water Sources.

87.     Samples taken from Plaintiff's Water Sources confirmed the presence of multiple PFAS compounds in the Weirton Water Sources, including both the groundwater well and the Ohio River, including but not limited to PFOA and PFOS.

88.     The Safe Drinking Water Act, 42 U.S.C. § 300f et seq., authorizes the EPA to require public water systems to monitor for contaminants that are suspected to occur in drinking water but for which enforceable drinking water standards have not yet been established. Pursuant to this authority, EPA promulgated the Unregulated Contaminant Monitoring Rule ("UCMR"), which requires public water systems serving large populations to periodically test finished drinking

23

water for specified contaminants and report the results to EPA. *See* 42 U.S.C. § 300j-4(a)(2); 40 C.F.R. § 141.40. The purpose of the UCMR program is to generate nationally representative data concerning the occurrence of emerging contaminants in drinking water and to inform EPA's regulatory determinations regarding whether such contaminants—including PFAS—should be regulated under the SDWA.

89.     As part of the current monitoring cycle, EPA has required public water systems across the United States to conduct testing for multiple PFAS compounds, including PFOA and PFOS. Public water systems must collect samples from designated entry points to the distribution system—representing finished water delivered to consumers—and analyze those samples using EPA-approved laboratory methods.

90.     Consistent with these federal monitoring requirements, Plaintiffs conducted monitoring of its finished drinking water for PFAS compounds pursuant to EPA's Unregulated Contaminant Monitoring Rule. The results of this monitoring were publicly reported in the Weirton Water Board's Consumer Confidence Report covering calendar year 2024.

91.     Testing results of this monitoring confirmed the presence of PFAS compounds in the finished drinking water supplied to Weirton residents. Among other detections, PFOS was measured at concentrations of approximately 7.4 parts per trillion ("ppt") in February 2024, 8.2 ppt in May 2024, and 7.8 ppt in August 2024. PFOA was also detected, including a measured concentration of approximately 4.1 ppt in August 2024, with additional sampling events reporting concentrations below the laboratory reporting limit but consistent with the presence of the compound in the system.

92.     The detection of these PFAS compounds in finished drinking water demonstrates that PFAS contamination has migrated into the source water utilized by Plaintiffs and has entered

24

the public drinking water supply. Because sampling was conducted at the entry point to the distribution system—after treatment but before distribution to customers—these monitoring results confirm that PFAS, including PFOA and PFOS, were present in water delivered to homes and businesses served by the Weirton public water system.

93. The presence of PFAS, including PFOA and PFOS, in Weirton's finished drinking water is consistent with the release and migration of PFAS from upstream and nearby industrial sources into the Ohio River and associated hydrologic systems that supply the City's drinking water. The PFAS detections reported by the Weirton Area Water Board therefore constitute evidence that PFAS released into the environment have migrated into and contaminated the Weirton municipal drinking water supply.

94. To comply with EPA's new drinking water standards, Plaintiffs must construct significant additional treatment infrastructure for removal of PFOA and PFOS. Plaintiffs have already begun designing and planning this new treatment system and have expended, and will continue to expend, significant funds to complete it and to maintain it for decades to come.

## FIRST CAUSE OF ACTION
### *Cost Recovery Liability Pursuant to 42 U.S.C. § 9607 (CERCLA)*

95. Plaintiffs repeat, re-allege, and incorporate each and every allegation set forth in all other paragraphs of this Complaint, as if fully set forth herein, and further allege as follows:

96. Under CERCLA, 42 U.S.C. §§ 9601, et seq., owners and operators of facilities are liable for "costs of response incurred by any…person" occasioned by a "release, or a threatened release which causes the incurrence of response costs, of a hazardous substance," and other forms of compensation. 42 U.S.C. § 9607(a).

97. Plaintiff is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

25

98. Defendants Arcwood East Liverpool and its Heritage predecessors are each a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

99. Defendants Arcwood East Liverpool and its Heritage predecessors are "owners" and/or "operators" of the East Liverpool Facility within the meaning of 42 U.S.C. § 9607(a)(1) and/or (2) and are therefore "potentially responsible parties" ("PRPs") under CERCLA. Defendants Arcwood Transport and its Heritage predecessors are "transporters" and/or "arrangers" that accepted and transported hazardous substances to the East Liverpool Facility and other disposal or treatment locations, within the meaning of 42 U.S.C. § 9607(a)(3)–(4), and are likewise PRPs.

100. The East Liverpool Facility is a "facility" within the meaning of 42 U.S.C. § 9601(9) because it is a site or area where hazardous substances have been deposited, stored, disposed of, placed, or otherwise come to be located.

101. PFOA and PFOS are each a "hazardous substance" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), by designation pursuant to Section 102 of CERCLA, 42 U.S.C. § 9602.

102. CERCLA defines the term "release" broadly and it means, among other things, "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment…." 42 U.S.C. § 9601(22).

103. There have been "releases" and/or "threatened releases" of hazardous substances from the East Liverpool Facility into the environment, specifically PFOS and PFOA, within the meaning of 42 U.S.C. § 9601(22).

104. The hazardous substances released from Defendants' facilities, namely PFOS and PFOA, have been and continue to be released within the source water protection area for Weirton,

26

or have flowed via the Ohio River to the source water protection area for Weirton, and are migrating into Plaintiffs' Water Sources and/or public drinking water supply.

105.    As a direct and proximate result of Defendants' releases and threatened releases of PFAS from the East Liverpool Facility, Plaintiff has incurred and will continue to incur "necessary costs of response" consistent with the National Contingency Plan ("NCP") within the meaning of 42 U.S.C. § 9607(a)(4)(B), including but not limited to: (a) investigation, sampling, and analysis of PFAS in raw and finished water; (b) design, installation, operation, and maintenance of treatment systems and process modifications to remove PFAS from Plaintiff's drinking water; (c) provision of alternative or supplemental water supplies, as necessary; and (d) planning, oversight, and public communication related to PFAS contamination in the Weirton Water System.

106.    Each Defendant is therefore a responsible party pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and liable for necessary response costs as the owner or operator of a facility from which there was a release of hazardous substances into Plaintiffs' Water Sources and/or public drinking water supply.

107.    In addition, the Arcwood defendants are also responsible parties pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and liable for necessary response costs as arrangers and transporters of hazardous substances to disposal and/or incineration facilities from which there was a release of hazardous substances that are within Plaintiff's Water Sources and/or public drinking water supply.

108.    Defendants are strictly, jointly, and severally liable to Plaintiff under 42 U.S.C. § 9607(a) for all past and future response costs incurred by Plaintiff in connection with PFAS contamination affecting the Weirton Water System that are necessary and consistent with the NCP, together with prejudgment interest as provided by 42 U.S.C. § 9607(a)(4) and (a)(4)(B).

27

**SECOND CAUSE OF ACTION**
*Declaratory Judgment Pursuant to 42 U.S.C. §§ 9607(a) and 9613(g)(2) (CERCLA)*

109. Plaintiffs repeat, re-allege, and incorporate each and every allegation set forth in all other paragraphs of this Complaint, as if fully set forth herein, and further allege as follows:

110. CERCLA § 113(g)(2) provides in pertinent part: "In any action described in this subsection [, which includes 42 U.S.C. §§ 9607(a),] the court shall enter a declaratory judgment of liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 113 (g)(2).

111. By reason of the foregoing and pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), Plaintiffs are entitled to a declaratory judgment on liability and damages under 42 U.S.C. § 9607(a) for costs to remove and/or remediate the hazardous substances and PFAS in Plaintiffs' Water Sources and/or public drinking water supply as referenced herein.

112. A declaratory judgment will prevent the need for multiple lawsuits as Plaintiffs continue to incur costs for which Defendants are liable and will provide a resolution of the issue between the parties regarding further liability for future costs.

113. A declaratory judgment will establish Defendants' allocation of costs associated with addressing the presence of PFAS in Plaintiffs Water Sources and/or public water supply, insuring an equitable and efficient response to the problem.

114. Public interest will be served in that a declaratory judgment will ensure a prompt and environmentally proper response to the presence of PFAS in Plaintiffs' Water Sources and/or public drinking water supply.

115. Plaintiffs will continue to incur additional remedial and response costs, including but not limited to costs to investigate, test, monitor, design, install, operate and maintain treatment

28

systems, and take other measures to address the presence of PFAS in its property and Water Sources.

116. Plaintiffs' costs are and will be consistent with the National Contingency Plan, 40 C.F.R. Part 300.

117. Plaintiffs are thus entitled to a declaratory judgment regarding Defendants' liability for response costs and damages that will be binding on subsequent actions to recover further response costs or damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court to enter judgment in their favor against Defendants, jointly and severally, awarding all such relief the Court deems appropriate and just, including:[9]

1. An award of compensatory damages in an amount to be decided by a judge and/or jury, including damages for, but not limited to, investigation, clean-up, remediation, and monitoring costs incurred by Plaintiffs.

2. An order declaring judgment, liability and damages under 42 U.S.C. § 9607(a) for costs to remove and/or remediate the presence of PFAS in water drawn by Plaintiffs from Plaintiffs Water Sources and/or Water System.

3. An award to Plaintiffs for the costs of this suit and attorney fees.

4. Award Plaintiff such other relief as the Court deems just, equitable, and proper.

---

[9] Plaintiffs expressly disclaim recovery for PFAS contamination from aqueous film-forming foam (AFFF).

DATED: April 7, 2026

Respectfully submitted,

**WEIRTON AREA WATER BOARD** *and*
**THE CITY OF WEIRTON, WEST VIRGINIA,**
*Plaintiffs*

By: */s/ Frank L. Galucci III*
By: */s/ David R. Grant*
Frank L. Gallucci III, Esq. (OH Bar # 0072680)
David R. Grant, Esq. (OH Bar # 0065436)
Paul Grieco, Esq. (OH Bar # 0064729)
**PLEVIN & GALLUCCI COMPANY, L.P.A.**
55 Public Square, Suite 2222
Cleveland, OH 44113
Tel. (216) 861-0804
FGallucci@pglawyer.com
DGrant@pglawyer.com
PGrieco@pglawyer.com

Mark A. Colantonio, Esq. (OH Bar # 064676)
Clayton J. Fitzsimmons, Esq. (OH Bar # 0093114)
**FITZSIMMONS LAW FIRM PLLC**
1609 Warwood Avenue
Wheeling, WV 26003
Tel. (304) 277-1700
mark@fitzsimmonsfirm.com
clayton@fitzsimmonsfirm.com

James L. Simpson, Esq.
        *(Pro Hac Vice Forthcoming)*
**NAPOLI SHKOLNIK PLLC**
360 Lexington Avenue, 11th Fl.
New York, New York 10017
(212) 397-1000
JSimpson@napolilaw.com

Paul J. Napoli, Esq.
        *(Pro Hac Vice Forthcoming)*
**NS PR LAW SERVICES LLC**
1302 Avenida Ponce de Leon
San Juan, PR 00907
(833) 271-4502
PNapoli@nsprlaw.com